**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Patrick Atkinson, an individual, and | ) | |
| The God's Child Project, a North Dakota | ) | **ORDER GRANTING PARTIAL** |
| nonprofit organization, | ) | **SUMMARY JUDGMENT TO** |
| | ) | **DEFENDANTS** |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| James McLaughlin, an individual,  and | ) | Case No. 1:03-cv-091 |
| Roberta McLaughlin, an individual, | ) | |
| | ) | |
| Defendants. | ) | |

_____

Before the Court is the Defendants' Motion for Summary Judgment filed on July 26, 2006. The Plaintiffs filed a response in opposition on August 21, 2006, and both parties have submitted supplemental responses and reply briefs over the last month.  For the reasons outlined below, the motion is granted in part and denied in part.

## I.    BACKGROUND

The God's Child Project is a North Dakota nonprofit corporation with its headquarters located in Bismarck, North Dakota.  The God's Child Project has an organized volunteer network that "provides health care, medical care, housing, food and education to . . . children, adolescents, and young adults, and provides educational and health services for . . . poor persons in nine departments across Guatemala."  Complaint, ¶ 2.  The plaintiff, Patrick Atkinson ("Atkinson"), is a resident of North Dakota who founded the God's Child Project in 1991 and continues to serve as the executive director.

Prior to founding the God's Child Project, Atkinson worked for the Covenant House from approximately 1982-1990. See Docket No. 85-12. The Covenant House is a charitable organization headquartered in New York. It is similar to the God's Child Project in that it is a charitable organization that operates facilities in Guatemala and provides assistance to children and adolescents. See Docket No. 89-5.

From July of 1997 to March of 1998, the defendants, Dr. James McLaughlin and Roberta McLaughlin ("the McLaughlins"), volunteered for the God's Child Project in Guatemala through a Guatemalan-registered charity entitled Association Nuestros Ahijados which was also founded by Atkinson. In March of 1998, the McLaughlins were suspended and ultimately terminated from their volunteer positions.[1] After their dismissal, the McLaughlins compiled a list of allegations against Atkinson and, with the assistance of others, filed them with various Guatemalan authorities.

The McLaughlins returned to the United States in March of 1998. In April of 1998, and upset with Atkinson over being terminated, the McLaughlins began emailing the Project's board members as well as more than thirty of the Project's supporters claiming that they had been improperly terminated and questioning Atkinson's ethics and character. See Docket 85-30. Later in April 1998, the McLaughlins sent an email to Project supporters containing a copy of a previous letter in which they similarly questioned Atkinson's character. The McLaughlins requested that the supporters discontinue donations to the Project and that they write to board members to investigate the McLaughlin's serious concerns about Atkinson and the God's Child Project. See Docket 85-29.

---

[1] The Plaintiffs' complaint sets forth the following reasons for the McLaughlins' dismissal: "(a) on suspicion of misappropriating funds from God's Child and Nuestros Ahijados; and (b) because the McLaughlins admitted to breaking and entering the private residence of a Guatemalan family."

In response to the McLauglins' email, the Project received numerous letters from donors in which the donors cancelled their support.  <u>See</u> Docket No. 98-8.

On June 1, 1998, the McLaughlins began emailing former God's Child Project volunteers and alleging that Atkinson had caused the McLaughlins' landlord to physically threaten them, and that Atkinson had purchased a house for two male prostitutes with money from the Covenant House. <u>See</u> Docket 98-5.   On June 3, 1998, the McLaughlins sent out emails to at least twenty volunteers alleging that Atkinson had been arrested and that two boys had been located who would testify that Atkinson had sexually abused them.  <u>See</u> Docket No. 85-33.  The McLaughlins admittedly took no steps to determine the accuracy of the email before sending it.   <u>See</u> Deposition of James McLaughlin, p. 197.

As a follow-up to the June 3, 1998, emails, the McLaughlins prepared and caused to be widely distributed an international press release alleging that Atkinson had been arrested on charges of sexually abusing young boys.  <u>See</u> Docket 85-34.   The press release alleged that Atkinson had been forced to resign his position with the Covenant House in the early 1990s because of financial and sexual improprieties related to the misdeeds of former Covenant House Leader Father Bruce Ritter.   The press release also stated that a number of boys were willing to testify that Atkinson molested them while in the God's Child Project.   A copy of the press release was sent to the Associated Press Reuters and to the New York Times.  <u>See</u> Deposition of James McLaughlin, p. 92; Docket No. 85-114 at Bates CH143.  The press release resulted in media inquiries to Atkinson and the God's Child Project.

On June 7, 1998, the McLaughlins sent another email to some of the recipients of the press release.  <u>See</u> Docket No. 85-33.  Apparently in response to reporters' statements that there was no

record of Atkinson's arrest, the McLaughlins alleged that "[a] coverup is a strong possibility." On June 12, 1998, the McLaughlins distributed an article which appeared in the June 11, 1998, Guatemalan newspaper <u>Siglo XXI</u>. The article contained accusations that Akinson had sexually abused children. <u>See</u> Docket No. 85-34. The McLaughlins claim that the source of their information for the press releases and emails was an investigator name Toledo. <u>See</u> Deposition of James McLaughlin, pp. 109, 196-199. James McLaughlin testified that he quit trusting Toledo in 1998 because Toledo had filed charges against Atkinson without first consulting an attorney. <u>See</u> Deposition of James McLaughlin, p. 80. However, McLaughlin sent the email and press release based on the information provided by Toledo even after McLaughlin had quit working with Toledo because he believed Toledo to be an untrustworthy person.

Sometime after leaving Guatemala and returning to the United States, the McLaughlins filed accusations of sexual abuse against Atkinson with the Federal Bureau of Investigations in Albuquerque, New Mexico and in Miami, Florida. <u>See</u> Deposition of James McLaughlin, pp. 117-118. The McLaughlins relayed the information they had learned from Toledo as well as additional accusations made previously by Bruce Harris ("Harris"). Harris was the successor to Atkinson's position in the Covenant House as the executive director for Casa Alianza - a Guatemalan charitable entity operated by the Covenant House. <u>See</u> Deposition of James McLaughlin, p. 126. Harris allegedly told the McLaughlins that Atkinson had purchased a home for male prostitutes and that Atkinson had taken inappropriate pictures of nude boys. <u>See</u> Deposition of James McLaughlin, pp. 122-123, 127-128. The McLaughlins also told the FBI that Atkinson was sexually abusing Francisco Choc, a boy in his care. The McLaughlins alleged that the adoption of Atkinson's son was somehow inappropriate. <u>See</u> Deposition of James McLaughlin, pp. 137-139. James McLaughlin

4

testified that he had no personal knowledge whether Atkinson had sexually abused children or others, or whether Atkinson is a pedophile.  See Deposition of James McLaughlin, p. 137.

During the summer of 1998, the McLaughlins sent numerous emails to Hanley Denning, a long-time God's Child Project volunteer, and relayed to her their allegations against Atkinson.  See Docket No. 98-21.  These emails were sent from May 19, 1998, to August 16, 1998, and repeated allegations that Atkinson had committed child abuse and claimed to know more about Atkinson. While asserting these allegations, the McLaughlins urged Denning to leave her position with the God's Child Project.

Sometime in 1998, after leaving Guatemala and discontinuing their work with Toledo, the McLaughlins hired Guatemalan Jose Reanda to investigate whether Atkinson and the God's Child Project were guilty of sexually abusing children.  See Deposition of James McLaughlin, p. 58.  The McLaughlins claim Reanda sent them a report in Spanish and they had it translated by a Spanish teacher.  See Deposition of James McLaughlin, pp. 70-71.  The McLaughlins published the contents of the report, but failed to keep a copy of the original report and did not take steps to verify the accuracy of the information contained in the report before sending it out.  See Deposition of James McLaughlin, pp. 67-68, 72.

In late November of 1998, the McLaughlins created a website entitled "Friends of Guatemalan Children" at the domain name www.guatemalanchildren.org (the "website").  The website allegedly contains "both specific false statements about Atkinson and God's Child as well as innuendo, insinuations and unrelated inferences to and about various individuals that have been accused and, in some cases, convicted, of criminal and other wrongful conduct."  Complaint, ¶ 24. Atkinson contends that the McLaughlins have used the website to conduct a "smear" campaign.  The

smear campaign included telephone calls made to God's Child Project board members, benefactors, regional and local ecclesiastical authorities, and political authorities discouraging them from supporting the God's Child Project.  Complaint, ¶ 26.

In April and May of 1999, the McLaughlins repeatedly contacted the North Dakota Attorney General's Office concerning Atkinson and the God's Child Project.  See Docket No. 55.  On May 7, 1999, the McLaughlins spoke via telephone with David Huey, an Assistant Attorney General with the Attorney General's Office and told Huey that Atkinson had used charitable funds to buy a home for two teenage male prostitutes.  See Docket No. 85-38.  On April 10, 1999, the McLaughlins sent a letter to the North Dakota Attorney General accusing Atkinson of financial improprieties and child sexual abuse.  The McLaughlins also attached a copy of the Friends of Guatemalan Children website. The McLaughlins had sent a similar letter to the North Dakota Secretary of State.

On May 11, 1999, the McLaughlins sent out emails encouraging the recipients to contact the Attorney General and report any negative information about Atkinson.  See Deposition of John Huebsch.  On May 13, 1999, the McLaughlins sent another letter and a packet of material to the North Dakota Attorney General.  See Docket No. 55, Ex. 6.  The May 13, 1999, letter alleged that Atkinson was fired from Casa Alianza, the Guatemalan charitable organization operated under the Covenant House, and that Atkinson had taken inappropriate or exploitive nude photographs of children.  The McLaughlins attached numerous documents including a translation of the article published in Siglo XII.

On May 17, 1999, the McLaughlins sent another letter and attachments to the North Dakota Attorney General.  See Docket No. 55, Ex. 7.  The McLaughlins stated that their previous letter contained a newspaper article that discussed Atkinson's sexual abuse charge for sexually abusing

the deaf-mute boy, Francisco Choc.  The letter indicated that the charge was made by Toledo based on statements made by Choc's teacher and that the teacher had subsequently recanted the allegation. The letter also alleged that Atkinson was engaged in illegal activities, that the Center for Legal Action, a Guatemala human rights organization, had enough information to encourage the government to charge Atkinson with abusing children, and that he is protected from prosecution by the Guatemalan government.  The Center for Legal Action has since stated that it does not possess any information which would support the McLaughlins' allegations.  See Docket No. 55, Ex. 9.  On May 19, 1999, the McLaughlins again emailed the North Dakota Attorney General stating that the Attorney General would soon be receiving a priority mail envelope that the McLaughlins had mailed that day.  See Docket No. 55, Ex. 10.

On June 14, 1999, the McLaughlins sent a six-page fax to the North Dakota Attorney General.  See Docket No. 55, Ex. 11.  The June 14, 1999, fax included what the McLaughlins claim is a translation of three interviews with Guatemalan minors in which the minors allege that Atkinson sexually abused them.  The interview was allegedly conducted by Toledo, whom the McLaughlins have now admitted they believed was untrustworthy as early as June of 1998.  See Deposition of James McLaughlin, p. 80.

On July 18, 1999, the McLaughlins emailed John Huebsch ("Huebsch"), the executive director of Common Hope, a Minnesota charitable corporation.  See Docket No. 97-9.  The email stated that a boy, Francisco, had neither seen nor heard of any sexual abuse by Atkinson, but did say that Atkinson had told boys to drop their trousers and spanked them.  The McLaughlins stated that they were just finishing the translation of a forty-seven (47) page report, ("Human Rights Report"),

7

on an investigation into Atkinson and that they would send the report to the North Dakota Attorney General once it was finished.

On July 28, 1999, the McLaughlins sent a copy of the Human Rights Report to the North Dakota Attorney General.  The Human Rights Report contained summaries of interviews of Guatemalan boys who were under Atkinson's care at one time.  <u>See</u> Docket No. 55, Ex. 2.  In the Human Rights Report several boys alleged that they witnessed acts of sexual abuse by Atkinson, and others alleged that they were the victims of sexual abuse by Atkinson.  On September 2, 1999, the McLaughlins emailed May Sing, a former God's Child Project volunteer, and referenced some tapes.  <u>See</u> Docket No. 55, Ex. 13.  The McLaughlins requested that May send "the tapes" to the Attorney General's office when she was done viewing them.  The record is devoid of the tapes.

Between February of 2000, and mid-June 2001, the McLaughlins sent numerous emails to Huebsch and others in an effort to obtain more information on Atkinson and the status of witnesses.  <u>See</u> Docket No. 97-9.  In an email to Huebsch dated June 15, 2001, the McLaughlins stated that it was likely that Toledo had attempted to bribe a witness to implicate Atkinson.  <u>See</u> Docket No. 97-9, Ex. 18.

The McLaughlins contend that their website, <u>www.guatemalanchildren.org,</u> was modified on only one occasion after July 1, 2001.  The McLaughlins contend that the last modification occurred on December 19, 2001, and consisted of an update to the listing of the Board of Directors for the God's Child Project.  <u>See</u> Docket Nos. 85-1, 89-1.  Atkinson contends that it is unclear when the website was last modified and that, at a minimum, significant substantive changes have been made to the website since it was first created.  <u>See</u> Docket No. 96.

8

On March 30, 2002, the McLaughlins received an email from Wendell Krueth who described himself as president and investigative coordinator of www.predator-hunter.com.  See Docket No. 97-8.  Krueth's email stated that his organization is a child-advocate organization based in Ohio, and that he lives in Minnesota.  Krueth requested information about Atkinson that he believed may be related to sexual abuse allegations against a Minnesota priest and the priest's accomplice who had traveled to Guatemala to do mission work.  The McLaughlins replied to Krueth and requested more information, and ultimately forwarded the email chain to Huebsch.  Atkinson contends that the McLaughlins' transmission of the forwarded email chain constitutes the publication of defamatory material against Atkinson.

On April 17, 2002, the McLaughlins received an email from Marilyn Moch ("Moch"), who serves on the International Association of Social Work, Human Rights Commission as Commissioner for North America.  See Docket No. 85-45.  Moch stated that she intended to make a trip to Bismarck and to visit the God's Child Project's board members and pastors of Bismarck churches.  Moch requested that the McLaughlins provide her with a list of Bismarck churches who provide support to the Project.  The McLaughlins then contacted Huebsch and asked him to forward information to Moch.  See Docket No. 97-8.

On April 18, 2002, the McLaughlins sent Krueth and Moch several Bismarck Tribune articles as well as contact information for a pastor in Bismarck.  See Docket No. 97-9.  Krueth responded  and stated that what he had seen up to that time had convinced him that Atkinson was "more than a bit shady, or worse."  See Docket No. 97-9.

On May 22, 2002, Moch emailed the McLaughlins and requested more information about the Covenant House and Bruce Harris.  See Docket No. 98-13.  The McLaughlins forwarded Moch's

9

request for information to Harris who then responded.   On November 10, 2002, the www.guatemalanchildren.org website received an email from <u>Bismarck Tribune</u> reporter Deena Winter.  <u>See</u> Docket No. 98-14.  Winter requested more information about the God's Child Project, and the McLaughlins forwarded the email request to Moch and asked her to respond.

On February 27, 2003, the McLaughlins emailed Huebsch and confirmed that Winter was interested in writing an article on the God's Child Project.  <u>See</u> Docket No. 97-8.  In their February 27, 2003, email, the McLaughlins state that Moch had been at the trial of Carlos Toledo in Guatemala and heard Atkinson testify that he had married a woman in southeast Asia and had a son. The McLaughlins also included the link to their website, <u>www.guatemalanchildren.org.</u>  On October 19, 2004, Huebsch emailed the McLaughlins and sought updated information about what was happening between the McLaughlins and Atkinson.

On February 21, 2005, Moch wrote to Richard Hirsch, Senior Vice President for Communications at the Covenant House, and informed him of Atkinson's and the God's Child Project's lawsuit against the McLaughlins.  <u>See</u> Docket No. 98-17.  On January 26, 2006, Atkinson and the Project were notified by Kiwanis International that they had been selected to be Kiwanis International's 2006 recipients of the Kiwanis World Service Medal.  <u>See</u> Docket No. 121-2.  The World Service Medal is accompanied by a $10,000 grant from the Kiwanis International Foundation to assist the recipient in service work.  Atkinson and the God's Child Project were to receive the World Service Medal at the Kiwanis International's International Convention which was held on June 28-July 1, 2006.

On or about June 14, 2006, the Kiwanis International emailed a document entitled "Summary of Situation" to its board members.  <u>See</u> Docket No. 121-3.  The "Summary of Situation" document

10

states that a "highly respected children's organization voic[ed] concerns about allegations surrounding Mr. Atkinson...."  The document discussed the website, www.guatemalanchildren.org, and listed some of the allegations asserted against Atkinson including allegations made during Atkinson's time with Covenant House and with the God's Child Project.  On June 16, 2006, the Kiwanis International informed Atkinson that they had rescinded the World Service Medal and that neither Atkinson nor the God's Child Project would receive the award.  See Docket No. 120.

In an effort to resolve the present dispute, Atkinson and the God's Child Project attempted to contact the McLaughlins in October of 2002, to request that they retract their website.  See Docket No. 96.  At the time the McLaughlins received notice of the letter they were traveling in Argentina and Brazil.  On November 7, 2002, an attorney responded on behalf of the McLaughlins and asked what portions of the website were false or misleading.  On February 24, 2003, an attorney for Atkinson responded and included a copy of Atkinson's complaint.

On July 28, 2003, Atkinson commenced this action which was more than four years after the website in question was established.  Because Atkinson had difficulty locating the McLaughlins, Atkinson's attorney requested that the McLaughlins waive service.  The McLaughlins apparently refused to waive service and Atkinson was able to locate them and had the McLaughlins personally served in Cambodia. James McLaughlin was served on June 5, 2004, and Roberta McLaughlin was served on July 2, 2004.  On August 16, 2004, the McLaughlins filed a Motion to Dismiss for Failure to Prosecute and Lack of Personal Jurisdiction.  See Docket No. 19.  On November 4, 2004, the Court issued an Order Denying Defendants' Motion to Dismiss and holding that the exercise of personal jurisdiction over the McLaughlins is proper and that dismissal for failure to prosecute was unwarranted.  See Docket No. 37.  On July 26, 2006, the McLaughlins filed a motion for summary

11

judgment asserting that the two-year statute of limitations barred Atkinson's defamation claims, and that Atkinson's claim for tortious interference with business was essentially a disguised defamation claim and should be barred under the two-year statute of limitations for defamation claims.


## II.    STANDARD OF REVIEW

It is well-established that summary judgment is appropriate when, viewed in a light most favorable to the non-moving party, there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Graning v. Sherburne County, 172 F.3d 611, 614 (8th Cir. 1999). A fact is "material" if it might affect the outcome of the case and a factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The basic inquiry for purposes of summary judgment is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. Quick v. Donaldson Co., Inc., 90 F.3d 1372, 1376 (8th Cir. 1996). The moving party has the initial burden of demonstrating to the Court that there are no genuine issues of material fact. If the moving party has met this burden, the non-moving party cannot simply rest on the mere denials or allegations in the pleadings. Instead, the non-moving party must set forth specific facts showing that there are genuine issues for trial. Fed. R. Civ. P. 56(e). A mere trace of evidence supporting the non-movant's position is insufficient. Instead, the facts must generate evidence from which a jury could reasonably find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

## II.   <u>LEGAL DISCUSSION</u>

This action is based on diversity jurisdiction.  The Court will apply the substantive law of North Dakota.  <u>Paracelsus Healthcare Corp. v. Philips Med. Sys.</u>, 384 F.3d 492, 495 (8th Cir. 2004). In the absence of controlling North Dakota law, the Court is obligated to predict what North Dakota law is based upon "relevant state precedent, analogous decisions, considered dicta, ... and any other reliable data."  <u>Bockelman v. MCI Worldcom</u>, 403 F.3d 528, 530 (8th Cir. 2005) (quoting <u>BoBass v. Gen. Motors Corp.</u>, 150 F.3d 842, 846-47 (8th Cir. 1998)).

### A.   <u>THE STATUTE OF LIMITATIONS ON DEFAMATION CLAIMS</u>

Section 28-01-18(1) of the North Dakota Century Code provides that a defamation action for libel or slander must be commenced within two (2) years after the claim for relief has accrued. <u>Sanderson v. Walsh County</u>, 712 N.W.2d 842, 846 (N.D. 2006).  Atkinson commenced this action on July 28, 2003 which was more than four years after the McLaughlins' website was created.  As a result, the McLaughlins contend that Atkinson is barred from proceeding with defamation claims based on events that occurred prior to July 28, 2001.  The McLaughlins contend that after July 28, 2001, they neither made any defamatory statements, nor did they republish any of the alleged defamatory publications made prior to July 28, 2001.  Atkinson argues that some or all of the publications made by the McLaughlins survive the statutory time-bar because: (1) the statute of limitations was tolled, (2) the continuing tort doctrine applies, (3) the republication rule applies, (4) the discovery rule applies, and (5) there were defamatory statements were made after July 28, 2001. The Court will address each in turn.

1.        **TOLLING THE STATUTE OF LIMITATIONS**

Section 28-01-32 of the North Dakota Century Code provides:

> If any person is out of this state at the time a claim for relief accrues against that person, an action on such claim for relief may be commenced in this state at any time within the term limited in this chapter for the bringing of an action on such claim for relief after the return of such person into this state.  If any person departs from and resides out of this state and remains continuously absent therefrom for the space of one year or more after a claim for relief has accrued against that person, the time of that person's absence may not be taken as any part of the time limited for the commencement of an action on such claim for relief. The provisions of this section, however, ... do not apply if this state's courts have jurisdiction over a person during the person's absence.

N.D.C.C. § 28-01-32 (2005).  In pertinent part, Section 28-01-32 provides for the tolling of the statute of limitations if a defendant is absent from the state, but does not apply if the state court had jurisdiction over the absent party during that party's absence.

The McLaughlins contend that Section 28-01-32 only applies to individuals who reside in North Dakota and then leave for a period of time.  However, this argument is without merit as the North Dakota Supreme Court expressly held in Loken v. Magrum, 380 N.W.2d 336, 341 (N.D. 1996), "that Section 28-01-32, N.D.C.C., applies to both residents and nonresidents."

Of importance is the fact that Section 28-01-32 was amended in 1989 so that its provisions do not apply if the state courts in North Dakota have jurisdiction over a person during that person's absence.  Fuson v. Schaible, 494 N.W.2d 593, 598 n.10 (N.D. 1992).  Prior to the 1989 revision, the North Dakota Supreme Court held that "the availability of long-arm service of process did not supersede the tolling of the statute of limitations during a defendant's absence from the state." Loken v. Magrum, 380 N.W.2d 336, 341 (N.D. 1986) (citing Wlasvik v. Brandel, 298 N.W.2d 375, 376-377 (N.D. 1980)).  In Loken, the North Dakota Supreme Court reasoned that, if the tolling statute should be changed to reflect the expansive long-arm service of process provisions, it was for

14

the Legislative Assembly of North Dakota to change and not the court, and at that time the Legislature had not expressly provided an exception to the tolling of the statute of limitations.  In 1989, the Legislature amended the statute to create an exception to the tolling provision when the "state's courts have jurisdiction over a person during the person's absence."  N.D.C.C. 28-01-32. The North Dakota Supreme Court has yet to interpret the statute in light of the 1989 amendment. However, the Supreme Court has suggested that the amendment was in response to Walsvik v. Brandel, and Loken v. Magrum.  See Muller v. Custom Distributors, Inc., 487 N.W.2d 1, 3 n.4 (N.D. 1992); Fuson v. Schaible, Fuson v. Schaible, 494 N.W.2d 593, 598 n.10 (N.D. 1992).  On its face, and in the absence of any direction from the North Dakota Supreme Court, Section 28-01-32 clearly provides that a statute of limitations is not tolled with the absence of a party from the state if the state courts have jurisdiction over the absent party.  (emphasis added).

Atkinson contends that he attempted to contact the McLaughlins in early October 2002, but alleges that the McLaughlins were out of the country for a considerable length of time and were evasive.  As a result, Atkinson argues that he was unable to obtain service of process on James McLaughlin until June 5, 2004, and on Roberta McLaughlin until July 2, 2004.  Counsel for Atkinson argues that the policy behind the statute is to remedy the problem of locating a nonresident defendant before the expiration of the statute of limitations.  Atkinson further argues that to interpret Section 28-01-32 to prevent the tolling of the statute of limitations whenever the state has "long-arm" jurisdiction over the defendant would render the statute meaningless.  Atkinson supports his claim by citing numerous cases in other jurisdictions that have tolled the statute of limitations when the defendant could not be found or personally served with process.  See Greenwood v. Wierdsma, 741 P.2d 1079, 1983 (Wyo. 1987) (applying Wyoming law); Witt v. American Trucking Ass'n, 860

15

F. Supp. 295 (D.S.C. 1994) (applying South Carolina law); <u>South v. Montoya</u>, 537 S.E.2d 367 (Ga. Ct. App. 2000) (applying Georgia law); <u>Summerrise v. Stephens</u>, 454 P.2d 224 (Wash. 1969) (applying Washington law).  The Court finds these cases to be distinguishable.

In <u>Greenwood v. Wierdsma</u>, a Wyoming tolling statute provided that the statute of limitations would be tolled when a person is out-of-state or has absconded or concealed himself. <u>Greenwood v. Wierdsma</u>, 741 P.2d 1079, 1082-1083 (Wyo. 1987) (citing to Wyo. Stat. Ann. § 1-3-107 (1977)).  However, the statute provided no tolling exception when the state courts have jurisdiction over the person.  In <u>Greenwood</u>, the defendant cited to the Wyoming long-arm statute and argued that the long-arm statute impliedly modified the tolling provision to allow the statute of limitations to run as long as the state had long-arm jurisdiction over the defendant.  <u>Id.</u> (citing Wyo. Stat. Ann. § 5-1-107 (1977)).  The Wyoming Supreme Court refused to hold that the long-arm jurisdiction statute impliedly modified the tolling statute.

In the other cases cited by Atkinson, none of the state tolling statutes at issue provided an exception to the tolling provision when the state courts have jurisdiction over a person during that person's absence.  <u>See</u> <u>Witt v. American Trucking Ass'n</u>, 860 F. Supp. 295 (D.S.C. 1994) (citing S.C. Code Ann. § 15-3-30 (1976)); <u>South v. Montoya</u>, 537 S.E.2d 367 (Ga. Ct. App. 2000) (citing Ga. Code Ann. § 9-3-94 (2006)); <u>Summerrise v. Stephens</u>, 454 P.2d 224 (Wash. 1969) (citing Wash. Rev Code § 4-16-180 (1986)).

It should be noted that the position asserted by Atkinson overlooks his ability to obtain service of process by publication if personal service could not have been made after a diligent attempt was undertaken to locate the McLaughlins.  <u>See</u> N.D.R. Civ. P. 4(e).  The ability to serve process by publication eliminates the need to locate a nonresident who may be difficult or

impossible to find.  Section 28-01-32 clearly provides that the statute of limitations is not tolled when the North Dakota "courts have jurisdiction over a person during the person's absence."[2] Service in this case could have been easily achieved by publication.

On November 4, 2004, the Court held that the exercise of personal jurisdiction over the McLaughlins was proper and does not offend traditional concepts of due process, and that the state courts have personal jurisdiction over the McLaughlins.  It is clear and undisputed that the McLaughlins are subject to the long-arm jurisdiction of North Dakota.  After an exhaustive review of the relevant North Dakota statutes and case law, as well as authority from other jurisdictions, the Court finds that the statute of limitations as to Atkinson's defamation claims was not tolled by the defendants' absence from North Dakota.

---

[2] If, as the plaintiffs argue, the North Dakota Legislature had intended Section 28-01-32 of the North Dakota Century Code to toll the statute of limitations when a person cannot be found for the purpose of personal service, it could have included a provision similar to other states with tolling statutes.  See MINN. STAT. § 541.13 (2006) (providing that the statute of limitations is tolled when a person is out of the state and "is not subject to process under the laws of this state or after diligent search the person cannot be found for the purpose of personal service when personal service is required").  The Illinois "Absence from State" tolling statute provides:

(a) If, when the cause of action accrues against a person, he or she is out of the state, the action may be commenced within the times herein limited, after his or her coming into or return to the state; and if, after the cause of action accrues, he or she departs from and resides out of the state, the time of his or her absence is no part of the time limited for the commencement of the action.

(b) For purposes of subsection (a) of this Section, no person shall be considered to be out of the State or to have departed from the State or to reside outside of the State during any period when he or she is subject to the jurisdiction of the courts of this State with respect to that cause of action pursuant to Sections 2-208 and 2-209 of this Act, Section 10-301 of "The Illinois Vehicle Code", Section 5.25 of the "Business Corporation Act of 1983", or any other statute authorizing service of process which would subject that person to the jurisdiction of the courts of this State. If a person files an action in a court of this State and attempts to secure service of process upon a defendant pursuant to a statute referred to in the preceding sentence, but does not obtain service of process upon such defendant, such defendant shall not be considered to be subject to the jurisdiction of the courts of this State at the time such action was filed, for purposes of the preceding sentence of this section.

735 Ill. Comp. Stat. 5/13-208 (2006) (emphasis added).

2.    **THE CONTINUING TORT DOCTRINE**

Atkinson contends that the McLaughlins' alleged defamatory statements were part of a single continuing course of conduct and that, under the continuing tort doctrine, the statute of limitations did not begin to run until after the conduct ceased.  The continuing tort doctrine provides that if a "wrongful act is continuous or repeated, the statute of limitations begins to accrue from the date of each wrong or from the end of the continuing wrongful conduct."  51 Am. Jur. 2d <u>Limitation of Actions</u> § 168 (2006).

Atkinson has cited no case in North Dakota, or elsewhere, in which the continuing tort doctrine has been applied to libel and slander cases.  <u>See</u> <u>Wallace v. Skadden, Arps, Slate, Meagher & Flom</u>, 715 A.2d 873, 882 -883 (D.C. 1998) (refusing to apply the continuing tort doctrine to defamation cases and stating that the court was unable to find any such cases applying the continuing tort doctrine to libel and slander claims); <u>Texas Disposal Systems Landfill, Inc. v. Waste Management Holdings, Inc.</u>, No. 03-03-00631-CV, 2005 WL 1489681, *6 -7 (Tex. App. 2005) (unpublished) (stating that the court could not find any authority that has broadened the continuing tort doctrine to include defamation or tortious interference actions).

In <u>King v. Phelps Dunbar, L.L.P.</u>, 743 So.2d 181, 192 (La. 1999), the court reasoned:

The principle behind the continuing tort doctrine is that it protects plaintiffs from acts which by themselves may not be unlawful or sufficient to alert the plaintiff that his rights have been violated, but instead require a cumulative process to become actionable. In its early stages, the acts are not identifiable as unlawful, or may not have crossed the threshold that separates the nonactionable from the actionable. Thus, where the unlawful practice manifests itself over time, rather than as a series of discrete acts or by a defining act alerting the plaintiff of a violation of his rights, the plaintiff is relieved of proving that the entire violation occurred within the actionable period, providing the plaintiff proves a series of related acts, one of which falls within the prescriptive period. Nonetheless, the very concept of cumulation in the continuing tort doctrine suggests a critical limiting principle: A plaintiff may not rely upon the continuing tort doctrine unless it would be unreasonable to expect that

18

the plaintiff knew or should have known that his rights were being violated by unlawful conduct that renders the action untimely.

Id. (internal citations omitted). It is clear that "the running of the statute [cannot] be prevented by repetitions of the [defamation], although, of course, a separate action will lie for any repetition within the statutory time." 53 C.J.S. Libel and Slander § 122, at 206 (1987).

It is undisputed that Atkinson knew of alleged defamatory statements and of the defamatory website as early as November 1998. See Deposition of Patrick Atkinson, pp. 33, 45, 47, 49, 296. This lawsuit was commenced on July 28, 2003, more than four years after the creation of the website. The Court finds that the McLaughlins' statements, if defamatory, were clearly actionable in November of 1998. Atkinson cannot seek to toll the two-year statute of limitations by sitting back and allowing the alleged defamatory acts to continue. Absent a clear indication from the North Dakota Supreme Court, and in light of the persuasive reasoning of other courts, the Court is unwilling to go against the great weight of authority and extend the continuing tort doctrine to defamation claims. The Court finds, as a matter of law, that the continuing tort doctrine does not apply to Atkinson's defamation claims.

### 3.   SINGLE PUBLICATION AND REPUBLICATION

"It is the general rule that each communication of the same defamatory matter by the same defamer, whether to a new person or to the same person, is a separate and distinct publication, for which a separate cause of action arises." Restatement (Second) of Torts § 577A, cmt. a (1971). However, the "single publication rule" is an exception to this general rule. Under the single publication rule, a single publication of a defamatory comment constitutes only one publication and

gives rise to only one cause of action.  Section 14-02-10 of the North Dakota Century Code codifies

the Uniform Single Publication Act and provides in pertinent part as follows:

> No person may have more than one claim for relief for damages for libel or slander
> or invasion of privacy or any other tort founded upon any single publication or
> exhibition or utterance, such as any one edition of a newspaper or book or magazine
> or any one presentation to an audience or any one broadcast over radio or television
> or any one exhibition of a motion picture. Recovery in any action must include all
> damages for any such tort suffered by the plaintiff in all jurisdictions.

***

N.D.C.C. § 14-02-10 (2005).

The North Dakota Supreme Court has not yet addressed the applicability of the single

publication rule to internet websites.  However, other jurisdictions are nearly unanimous in holding

that the single publication rule applies to defamation actions arising out of internet publications.[3]

Churchill v. State, 876 A.2d 311, 316 (N.J. Super. A.D. 2005); see also Firth v. State of New York,

775 N.E.2d 463 (N.Y. 2002) (providing that the single publication rule applies to defamation actions

arising out of allegedly defamatory written statements published on internet websites).  The court

in Firth adopted the single publication rule in a website defamation action and reasoned as follows:

> a multiple publication rule would implicate an even greater potential for endless
> retriggering of the statute of limitations, multiplicity of suits and harassment of
> defendants.  Inevitably, there would be a serious inhibitory effect on the open,
> pervasive dissemination of information and ideas over the Internet, which is, of
> course, its greatest beneficial promise.

---

[3] See, e.g., Oja v. U.S. Army Corps of Engineers,  440 F.3d 1122, 1136 (9th Cir. 2006); Van Buskirk v. N.Y. Times Co., 325 F.3d 87, 89-90 (2d Cir. 2003); Lane v. Strang Communications Co., 297 F. Supp. 2d 897, 899-900 (N.D. Miss. 2003); Mitan v. Davis, 243 F. Supp. 2d 719, 721-724 (W.D. Ky. 2003); Traditional Cat Ass'n, Inc. v. Gilbreath, 13 Cal. Rptr. 3d 353, 355, 358-363 (Cal. 2004); McCandliss v. Cox Enter., Inc., 593 S.E.2d 856, 858 (Ga. 2004); Abate v. Me. Antique Digest, No. 03-3759, 2004 WL 293903, *1-2 (Mass. Sup. Ct. 2004) (unpublished); E.B. v. Liberation Publ'ns, Inc., 77 N.Y.S.2d 133, 134 (2004).

20

<u>Firth v. State of New York</u>, 775 N.E.2d 463 (N.Y. 2002).  The Court finds the above-cited cases to be persuasive and is convinced that, if presented with the issue, the North Dakota Supreme Court would adhere to the majority rule and hold that the single publication rule applies to defamation actions arising out of internet publications.  The Court expressly finds that the single publication rule applies to the McLaughlins' website which was created in November of 1998.

However, even under the single publication rule, the courts have recognized that a website may be republished and create a new cause of action for defamation if the website is substantially modified.  <u>Churchill v. State</u>, 876 A.2d 311, 317 (N.J. Super. A.D. 2005); <u>Firth v. State of New York</u>, 775 N.E.2d 463, 465 (N.Y. 2002).  Republication triggers the start of a new statute of limitations and occurs upon a separate aggregate publication from the original, on a different occasion, which is not merely a delayed circulation of the original edition.  <u>See</u> Restatement Second of Torts § 577A, cmt. d (2006).  It is clear that the justification for this holding is that the second publication is intended to and does reach a new audience.

The McLaughlins contend that their website has only been updated on one occasion which occurred on December 19, 2001.  The McLaughlins do not dispute that they updated the listing of the names and addresses of the God's Child Project's Board of Directors on December 19, 2001.  To support their contention, the McLaughlins rely on the affidavit of Carl Muehlenweg.  Muehlenweg is the President of Lobo Internet Services (Lobo), the internet service provider and website host on which the defendants' website was posted.  Muehlenweg referenced a directory listing that shows all of the files located on the website and records the date the files were last modified.  The directory listing is a stored compilation of factual data and information prepared in the course of Lobo's business operation.  Atkinson contends that significant substantive changes

21

have been made to the McLaughlins' website and that there is a question of fact as to when those changes were made. Atkinson also contends that evidence from Muehlenweg is actually expert witness testimony and that the McLaughlins failed to properly disclose Muehlenweg as an expert witness.

Muehlenweg stated in his affidavit that he relied on Lobo's server records to determine when the McLaughlins' website at www.guatemalanchildren.org, was last modified. See Docket No. 89-1. It is clear that Muehlenweg's statements in his affidavit are simply a restatement of what the "directory listing" already provides. The Court finds that the "directory listing" which provides the file history for the McLaughlins' website is sufficient evidence as to when the website was last modified. Atkinson has set forth no specific facts to create a genuine issue of fact for trial as is required of the adverse party under Rule 56(e) of the Federal Rules of Civil Procedure to withstand a motion for summary judgment. See Fed. R. Civ. P. 56(e) (providing that "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.").

However, even if the "directory listing" is not considered to be sufficient evidence by itself to establish when the McLaughlins' website was last modified, the Court finds that Meuhlenweg's testimony would be admissible as lay opinion testimony. Brewer v. Jeep Corp., 724 F.2d 653, 657 (8th Cir. 1983).

Rule 701 of the Federal Rules of Evidence provides that a non-expert witness may testify to "opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not

based on scientific, technical, or other specialized knowledge within the scope of Rule 702." The Eighth Circuit has held that "[p]ersonal knowledge or perception acquired through review of records prepared in the ordinary course of business, or perceptions based on industry experience, is a sufficient foundation for lay opinion testimony." Burlington N. R.R. Co. v. State of Nebraska, 802 F.2d 994, 1004-1005 (8th Cir. 1986); see e.g., Farner v. Paccar, Inc., 562 F.2d 518, 520 (8th Cir. 1977) (allowing lay opinion testimony of truck operator with extensive experience in the industry regarding the proper use of safety chains); Gravely v. Providence Partnership, 549 F.2d 958, 961 (4th Cir. 1977) (allowing lay opinion testimony of company's president regarding relative safety of conventional versus spiral staircase).

In Burlington Northern Railroad Co. v. State of Nebraska, the Eighth Circuit found that a sufficient foundation had been laid for lay opinion testimony by a railroad executive who testified "based on based on knowledge derived from supervising railroad operations, years of experience in the industry, and review of employee accident reports prepared in the ordinary course of business...." 802 F.2d 994, 1005 (1986).

In this case, Muehlenweg has general knowledge about the internet and internet servers gained from his years operating Lobo and serving as the company's president. As president, Muehlenweg oversees and manages the business operations of Lobo and compiles and stores the "directory listings." As such, Muehlenweg's testimony as to when the McLaughlin's website was last modified is based on his personal knowledge as president of Lobo after reviewing the "directory listings." The Court finds that Muehlenweg's testimony is not based on scientific, technical, or other specialized knowledge and, therefore, a sufficient foundation has been laid for the lay opinion evidence.

The Court must next determine whether the December 19, 2001, modification to the website, the only modification that occurred during the two-year statute of limitation's time period (July 28, 2001-present), is sufficient to constitute republication.  Although North Dakota has not addressed the type of modifications required to constitute republication of a website, several cases from other states have addressed this issue.

In Firth v. State of New York, 775 N.E.2d 463, 466 (N.Y. 2002), the plaintiff claimed that the defendant's had republished their website when they added a report to the website that was unrelated to the defamatory material.  The plaintiff in Firth was a law enforcement officer who claimed that an article posted on a website was defamatory because it was critical of his managerial style and procurement of weapons.  The plaintiff filed a complaint and alleged defamation but the claim was barred by New York's statute of limitations on defamation claims.  The plaintiff then contended that the website had been republished by the addition of a Department of Motor Vehicle report posted within the plaintiff's statutory time period.  The court in Firth held that the addition to the website of a report unrelated to the defamatory material was not a substantial modification sufficient to constitute republication.  The court reasoned that "[t]he mere  addition of unrelated information to a Web site cannot be equated with the repetition of defamatory matter in a separately published edition of a book or newspaper...." Id.  The court went on to state, "[t]he justification for the republication exception has no application at all to the addition of unrelated material on a Web site, for it is not reasonably inferable that the addition was made either with the intent or the result of communicating the earlier and separate defamatory information to a new audience."  775 N.E.2d 463, 466.

Recently, the court in Churchill v. State, 876 A.2d 311 (N.J. Super. A.D. 2005), held that mere modifications to the way information is accessed, as opposed to changes in the nature of the information itself, does not constitute republication. Id. at 319. In Churchill, the website in question had been modified by moving and altering a menu bar and adding a "press release" that directly referenced the alleged defamatory report and made it more prominent and more easily accessible. Id. at 315. The New Jersey court found that such changes were "merely technical" and that, although such changes altered the means by which website visitors could access the report in question, they did not alter the "substance or form" of the report. Id. at 319.

Atkinson contends that the modifications made to the website by the McLaughlins are more like those in Davis v. Davis, 334 B.R. 874, 884 (W.D. Ky. 2005) (reversed on other grounds), where the court found the modifications to be substantive and sufficient to constitute republication. In Davis, the defendant created a website that detailed problems he had encountered during previous business dealings with the plaintiff. The defendant's website insinuated that the plaintiff and his family were a criminal enterprise. Although created outside the applicable statute of limitations period, the website was updated within the limitations period with a "Breaking News" section that contained links to public documents, namely warrants and bankruptcy filings, as well as the addition of two booking pictures of the plaintiff. The court found that the new material added to the defendants' website contained substantive information related to the plaintiff and, by reference, to the plaintiff's family, and was sufficient to constitute republication. Id. at 879.

In this case, the McLaughlins' last modified their website on December 19, 2001, to include an update to the names and addresses of the Board of Directors for the God's Child Project. The December 19, 2001, modification did not change the content or substance of the website that

25

Atkinson alleges is defamatory in nature.  While this modification was arguably more than a technical change  to the website, it clearly does not rise to the level of a substantive change such as the changes that occurred in <u>Davis v. Davis</u>.  Further, the update to the listing of the Board of Directors for the God's Child Project did not reasonably result in communicating the alleged defamatory information to a new audience.  The Court finds that the December 19, 2001, modification to the McLaughlins' website consisted of unrelated material which did not materially or substantially alter the substance or content of the website so as to cause its republication.

Atkinson next contends that the McLaughlins implicitly endorsed and republished the existing defamatory language on the website by consciously reviewing the website and editing only a portion of the material.  Atkinson has provided no support for the proposition that implicit endorsement constitutes republication.  The case law previously discussed holds against the allowance of implicit republication.  In <u>Firth</u>, the court stated that "[t]he justification for the republication exception has no application at all to the addition of unrelated material on a Web site...." <u>Firth v. State of New York</u>, 775 N.E.2d 463, 466 (N.Y. 2002).  The Court rejects Atkinson's argument for implicit republication.  The Court finds, as a matter of law, that the defamation claims arising out of the McLaughlins' website are barred by the two-year statute of limitations in North Dakota.

### 4.    DISCOVERY RULE

The North Dakota Supreme Court has held that a cause of action accrues on a defamation claim upon the publication of the false statement to a third party.  <u>Schultze v. Continental Ins. Co.</u>, 619 N.W.2d 510, 513 (N.D. 2000).  Generally, the statute of limitations on a cause of action begins

26

to run from the commission of the wrongful act giving rise to the cause of action. Schanilec v. Grand Forks Clinic, Ltd., 599 N.W.2d 253, 255 (N.D. 1999). However, the North Dakota Supreme Court has recognized that "this rule is often harsh and unjust, which is why so many courts have adopted the discovery rule." Id.

Under the "discovery rule," a cause of action does not accrue, and the limitations period does not begin to run, until a plaintiff "knew, or with the exercise of reasonable diligence should have known, of the wrongful act and its resulting injury." Wells v. First American Bank West, 598 N.W.2d 834, 838 (N.D. 1999). The test is an objective one with the focus being on "whether the plaintiff is aware of facts that would place a reasonable person on notice a potential claim exists, without regard to the plaintiff's subjective beliefs." Id.

Although the North Dakota Supreme Court has not yet addressed the issue of whether the discovery rule applies to defamation actions, under North Dakota law the "discovery rule" has been liberally applied to numerous statutory limitations on various causes of action based in tort or contract. See, e.g., Wells v. First American Bank West, 598 N.W.2d 834 (N.D. 1999) (contract actions); Beavers v. Walters, 537 N.W.2d 647, 650 (N.D. 1995) (fraud actions); Hebron Pub. Sch. Dist. No. 13 v. United States Gypsum Co., 475 N.W.2d 120, 126 (N.D. 1991) (contract and tort actions as well as claims based upon fraud and equity); Schanilec v. Grand Forks Clinic, Ltd., 599 N.W.2d 253 (N.D. 1999) (medical malpractice claim); Wall v. Lewis, 393 N.W.2d 758, 761 (N.D. 1986) (legal malpractice claim).

The majority of states that have addressed the applicability of the discovery rule to defamation claims have carved out a narrow exception and held that the discovery rule applies but

only in limited circumstances where the alleged defamatory statement was secretive or inherently undiscoverable.[4]  As the Mississippi Supreme Court reasoned:

> [The court is] convinced that the general policies underlying this statute of limitations will not be thwarted by adoption of the discovery rule in that limited class of libel cases in which, because of the secretive or inherently undiscoverable nature of the publication the plaintiff did not know, or with reasonable diligence could not have discovered, that he had been defamed. In such rare instances, we do not believe that a plaintiff can be accused of sleeping on his rights.

Staheli v. Smith,  548 So.2d 1299, 1303 (Miss. 1989).  The Court finds the reasoning of the Mississippi Supreme Court in Staheli to be persuasive.  The Court further finds that, if given the opportunity, the North Dakota Supreme Court would apply the discovery rule to defamation claims but only in those limited circumstances where the allegedly defamatory statements are secretive or inherently undiscoverable.  The Court must then determine whether the allegedly defamatory communications at issue were inherently undiscoverable and would trigger the discovery rule.

Atkinson alleges that the McLaughlins' numerous communications with the North Dakota Attorney General's Office from April 1999 through July of 1999 defamed both Atkinson and the God's Child Project.  Although the McLaughlins sent the communications to the Attorney General's Office well before the July 28, 2001, statutory cut-off date for defamation claims, Atkinson contends

---

[4] See e.g., Hobson v. Coastal Corp., 962 F. Supp. 1407, 1410 (D. Kan.1997) (limitations for defamation action based on oral statement regarding individual's employment history does not begin to run until discovery); Goodman-Herron v. Advanced Nav. & Positioning Corp., 940 F. Supp. 281 (D. Or.1996) (discovery rule applied to confidential oral publications made to friends, family and co-workers); Sears, Roebuck & Co. v. Ulman, 412 A.2d 1240 (Md. App.1980) (credit reporting agency's false report inherently undiscoverable until plaintiff applied for a credit account with a second retailer); White v. Gurnsey, 618 P.2d 975 (Or. 1980) (libelous memorandum on employee was of a confidential nature not likely to have been discovered in exercise of reasonable diligence); Manguso v. Oceanside Unified School Dist., 88 Cal. App.3d 725 (1979) (letter in teacher's permanent personnel file not inherently discoverable); Kittinger v. Boeing Co., 585 P.2d 812 (Wash. 1978) (discovery rule applies to confidential business memoranda when plaintiff has no means, in the exercise of reasonable diligence, to discover the defamation); Kelley v. Rinkle, 532 S.W.2d 947 (Tex. 1976) (credit agency report); Tom Olesker's Exciting World of Fashion, Inc. v. Dun & Bradstreet, Inc., 334 N.E.2d 160 (Ill. 1975) (distribution of credit reporting agency's report limited to subscribers makes statements contained therein inherently undiscoverable).

that the communications were not discovered until sometime after 2003.  Atkinson argues that the "discovery rule" applies and that the statute of limitations did not begin to run until Atkinson discovered the communications.  Atkinson further contends that the McLaughlins communications to the Attorney General's Office  were kept on file and were available only on request and thus were not published in any mass media forum.  The McLaughlins argue that once submitted to the Attorney General's Office, the communications became a matter of public record that were open and accessible for inspection during reasonable office hours and, as such, were not inherently undiscoverable.

The facts strongly suggest that the alleged defamatory letters and communications sent to the Attorney General's Office in 1999 are similar to the inherently undiscoverable or secretive publications which typically fall within the parameters of the discovery rule.  Although the communications became a matter of public record upon receipt by the North Dakota Attorney General's Office, Atkinson would have needed to know, or reasonably should have known, that such records existed in order to have requested them.  The McLaughlins contend that because the records were open to the public and accessible during regular business hours, Atkinson could have reasonably discovered the records at any time after they were filed.  In essence, the McLaughlins suggest that Atkinson should have made a blanket request for records that were unknown to him and which pertained to himself or the God's Child Project.  To impose such a burden would be unreasonable.  There is simply no evidence to indicate that Atkinson had actual or constructive knowledge that the McLaughlins had sent any alleged defamatory communications or information to the North Dakota Attorney General's Office in 1999, or at any other time which would have triggered a need to request such records.

Ultimately, Atkinson did not discover the letters and records until he commenced discovery in this lawsuit and made an open-records request to the Attorney General's Office. Although the McLaughlins' communications to the Attorney General's Office are arguably neither confidential nor secretive, the Court finds that the communications were inherently undiscoverable even with the exercise of reasonable care and diligence. The Court further finds, as a matter of law, that the discovery rule applies to the McLaughlins' communications to the North Dakota Attorney General's Office in 1999, and that a cause of action arising out of such communications would not be barred by the two-year statute of limitations.

### 5.   DEFAMATORY STATEMENTS AFTER JULY 28, 2001

It is clear and undisputed that the two-year statute of limitations on defamation claims does not bar evidence of alleged defamatory statements or acts that occurred after July 28, 2001, because this lawsuit was commenced on July 28, 2003. Starting in 2002, the record reveals a flurry of correspondence and communications between the McLaughlins and Marilyn Moch, Bruce Harris, John Huebsch, and others. On February 27, 2006, the McLaughlins emailed Huebsch and repeated information they had received from Moch that Atkinson was married to a woman in southeast Asia and had a son. (Docket No. 97-8). Atkinson denies ever being married and ever having a biological son. The February 27, 2003, email also included a link to the McLaughlins' website, www.guatemalenchildren.org. In addition, the McLaughlins received numerous requests for information related to Atkinson and the God's Child Project, and asked Huebsch and Moch to respond to the requests and to forward the desired information. (Docket Nos. 97-8, 98-14).

30

The evidence, when viewed in the light most favorable to Atkinson, creates genuine issues of material fact as to whether the McLaughlins published defamatory statements after July 28, 2001. After carefully reviewing the pleadings, exhibits, and the entire record, the Court finds that summary judgment as to any post-July 28, 2001, communications is not appropriate at this stage because there are genuine issues of material fact in dispute which need to be resolved at trial.

### B.    INTENTIONAL INTERFERENCE WITH BUSINESS

The North Dakota Supreme Court has recognized an action for tortious interference with business and has held that the following elements must be shown:

> in order to prevail on a claim for unlawful interference with business, a plaintiff must prove the following essential elements: (1) the existence of a valid business relationship or expectancy; (2) knowledge by the interferer of the relationship or expectancy; (3) an independently tortious or otherwise unlawful act of interference by the interferer; (4) proof that the interference caused the harm sustained; and (5) actual damages to the party whose relationship or expectancy was disrupted.

Lochthowe v. C.F. Peterson Estate,  692 N.W.2d 120, 126 (N.D. 2005).  The Supreme Court clarified what is required under the third element and stated that the plaintiff need not prove an independent tort to establish an independently tortious act.  Trade 'N Post, L.L.C. v. World Duty Free Americas, Inc., 628 N.W.2d 707, 720 (N.D. 2001).  "Rather, ... the plaintiff must prove that the defendant's conduct would be actionable under a recognized tort." Id.  Under North Dakota law, the statute of limitations for a claim based on tortious interference with business is six (6) years. N.D.C.C. § 28-01-16(5).   As a result, all of the alleged tortious acts asserted against the McLaughlins which date back to July 28, 1997, would fall within the applicable statute of limitations.

The McLaughlins contend that Atkinson's claim for tortious interference with business is in reality a disguised attempt to overcome the two-year statute of limitations for defamation actions. North Dakota law recognizes that defamation and tortious interference with business are independent torts.  See Trade'N Post v. World Duty Free Americas, Inc., 628 N.W.2d 707 (N.D. 2001); Jose v. Norwest Bank North Dakota, N.A., 599 N.W.2d 293 (N.D. 1999).  The claim for tortious interference with business requires Atkinson to prove not only that an independently tortious or unlawful act occurred, but he must also prove four additional elements, including that the McLaughlins knew of and actually interfered with Atkinson's business relationships or expectancy. The record reflects that the McLaughlins were aware that Atkinson was the founder and executive director of the God's Child Project and that, as a charitable organization, the God's Child Project relied on donations to operate.  See Docket No. 85-29.  With this knowledge, the record reflects that the McLaughlins sent numerous emails requesting, among other things, that persons discontinue their donations to the God's Child Project.  In response to the McLauglins' emails, the God's Child Project allegedly received numerous letters from donors in which the donors cancelled their support, i.e., the interference caused harm and resulting damages.  See Docket No. 98-8.

The McLaughlins have failed to provide legal authority for the proposition that a claim for tortious interference with business is a disguised claim for defamation.  This argument has been flatly rejected by other jurisdictions and the Court finds such cases to be persuasive.  See Brewer v. Schact, 509 S.E.2d 378, 383 (Ga. Ct. App. 1998) (one-year statute of limitations applicable to plaintiff's defamation claim inapplicable to plaintiff's tortious interference claim); Wenthe v. Willis Corroon Corp., 932 S.W.2d 791, 796 (Mo. Ct. App. 1996) (the gist of plaintiff's allegations sought redress for alleged tortious interference was not an attempt to subvert the statute of limitations for

a slander action); Heritage Optical Ctr., Inc. v. Levine, 359 N.W.2d 210, 213 (Mich. Ct. App. 1984) (stating that "[w]e also find that defendant's argument, with which the trial court agreed, that plaintiff's slander count was merely a restatement of plaintiff's tortious interference with business relationship s claim is not meritorious.  Where two torts overlap a plaintiff may bring an action in both torts as long as damages are not duplicated."); Garrison v. Herber J. Thomas Memorial Hosp. Ass'n, 438 S.E.2d 6, 13 (W. Va. 1993) (stating that one of the elements for tortious interference is an intentional act which "could consist of defamatory statements or writings.  Yet, merely because one of the elements of tortious interference could require proof of defamatory statements of writings does not change the cause of action to defamation.").

The only North Dakota case cited in support of the McLaughlins' position is Rykowsky v. Dickinson Public School District No. 1, 508 N.W.2d 348 (N.D. 1983).  In Rykowsky, the Supreme Court of North Dakota held that an independent action for intentional infliction of emotional distress does not lie where the gravamen of complaint sounds in defamation.  Id. at 351-352.  However, Rykowsky did not address the treatment of a claim for tortious interference with business where the underlying tortious activity involves defamatory statements.  After a thorough review of the relevant case law, the Court finds, as a matter of law, that defamation and tortious interference with business are independent and distinct torts capable of sustaining separate and concurrent actions, and that Atkinson's claim for tortious interference with business is not time-barred.  In other words, all of the alleged tortious acts asserted against the McLaughlins which date back to July 28, 1997, would fall within the applicable six-year statute of limitations.

33

III.   <u>CONCLUSION</u>

In summary, the Court holds that Atkinson's defamation claims are barred by the applicable two-year statute of limitations except for those claims which may arise from the McLaughlins' communications with the North Dakota Attorney General's Office in 1999, <u>and</u> for those claims which may arise from communications that occurred after July 28, 2001.  In so holding, the Court finds that:  (1) the two-year statute of limitations on defamation claims <u>was not tolled</u> by the defendants' absence from North Dakota because the state courts retained jurisdiction over the McLaughlins during their absence from the state; (2) the continuing tort doctrine <u>does not apply</u> to defamation actions and does not extend the commencement date for the pursuit of Atkinson's defamation claims; (3) the single publication rule <u>does apply</u> to defamation actions which arise out of internet publications, i.e., websites, and the December 19, 2001, modification to the McLaughlins' website was minor and not substantive in nature, and did not result in a republication of the website that would retrigger the statute of limitations; (4) the discovery rule <u>does apply</u> to defamation cases but only in limited circumstances where the defamatory publication is inherently undiscoverable.  The Court finds that the McLaughlins' communications with the North Dakota Attorney General's Office in 1999, although a matter of public record, were "inherently undiscoverable"; and (5) Atkinson has created genuine issues of material fact as to whether communications made by the McLaughlins after July 28, 2001 are defamatory in nature.

Finally, the Court finds, as a matter of law, that the claims of defamation and tortious interference with business are independent and distinct torts capable of sustaining separate causes of actions.  A claim for tortious interference with business is subject to a six-year statute of limitations under North Dakota Law.  As a result, all of the alleged tortious acts asserted against the

34

McLaughlins which date back to July 28, 1997, occurred within the applicable six-year statute of limitations.  This would include the website that was created by the McLaughlins in November of 1998.

For the reasons outlined above, the Defendants' Motion for Summary Judgment (Docket No. 83) is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS SO ORDERED.**

Dated this 28th day of November, 2006.

*/s/ Daniel L. Hovland*
Daniel L. Hovland, Chief Judge
United States District Court

35