IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION

| | |
|---|---|
| Patrick Atkinson, an individual, and ) <br> The God's Child Project, a North Dakota ) <br> nonprofit organization, ) <br>   ) <br> Plaintiffs, ) <br>   ) <br> vs. ) <br>   ) <br> James McLaughlin, and ) <br> Roberta McLaughlin, ) <br>   ) <br> Defendants. ) | **ORDER GRANTING PLAINTIFFS'** <br> **MOTION TO AMEND COMPLAINT** <br><br><br> Case No. 1:03-cv-091 |

Before the Court is the plaintiffs' Motion for Leave to Assert Claim for Punitive Damages filed on August 30, 2005. For the reasons outlined below, the motion is granted.

## I.     BACKGROUND

The God's Child Project is a North Dakota nonprofit corporation with its headquarters located in Bismarck, North Dakota. The God's Child Project has an organized volunteer network that "provides health care, medical care, housing, food and education to . . . children, adolescents, and young adults, and provides educational and health services for . . . poor persons in nine departments across Guatemala." Complaint, ¶ 2. Patrick Atkinson, is a resident of North Dakota who founded the God's Child Project in 1991 and continues to serve as the executive director.

Prior to founding the God's Child Project, Atkinson worked for the Covenant House from approximately 1982-1990. See Docket No. 85-12. The Covenant House is a charitable organization headquartered in New York. It is similar to the God's Child Project in that it is a charitable

1

organization that operates facilities in Guatemala and provides assistance to children and adolescents. See Docket No. 89-5.

From July of 1997 to March of 1998, the defendants, Dr. James McLaughlin and Roberta McLaughlin ("the McLaughlins"), volunteered for the God's Child Project in Guatemala through a Guatemalan-registered charity entitled Association Nuestros Ahijados which was also founded by Atkinson. In March of 1998, the McLaughlins were suspended and ultimately terminated from their volunteer positions.[1] After their dismissal, the McLaughlins compiled a list of allegations against Atkinson and, with the assistance of others, filed them with various Guatemalan authorities.

The McLaughlins returned to the United States in March of 1998. In April of 1998, and upset with Atkinson over being terminated, the McLaughlins began emailing the God's Child Project's board members as well as more than thirty of the God's Child Project's supporters claiming that they had been improperly terminated and questioning Atkinson's ethics and character. See Docket 85-30. Later in April 1998, the McLaughlins sent an email to God's Child Project supporters containing a copy of a previous letter in which they similarly questioned Atkinson's character. The McLaughlins requested that the supporters discontinue donations to the God's Child Project and that they write to board members to investigate the McLaughlin's serious concerns about Atkinson and the God's Child Project. See Docket 85-29. In response to the McLaughlins' email, the God's Child Project received numerous letters from donors in which the donors cancelled their support. See Docket No. 98-8.

---

[1] Atkinson's complaint alleges that the McLaughlins were dismissed "on suspicion of misappropriating funds from God's Child and Nuestros Ahijados" and "because the McLaughlins admitted to breaking and entering the private residence of a Guatemalan family."

On June 1, 1998, the McLaughlins began emailing former God's Child Project volunteers and alleging that Atkinson had caused the McLaughlins' landlord to physically threaten them, and that Atkinson had purchased a house for two male prostitutes with money from the Covenant House. See Docket 98-5. On June 3, 1998, the McLaughlins sent out emails to at least twenty volunteers alleging that Atkinson had been arrested and that two boys had been located who would testify that Atkinson had sexually abused them. See Docket No. 85-33. The McLaughlins admittedly took no steps to determine the accuracy of the email before sending it. See Deposition of James McLaughlin, p. 197.

As a follow-up to the June 3, 1998, emails, the McLaughlins prepared and caused to be widely distributed an international press release alleging that Atkinson had been arrested on charges of sexually abusing young boys. See Docket 85-34. The press release alleged that Atkinson had been forced to resign his position with the Covenant House in the early 1990s because of financial and sexual improprieties related to the misdeeds of former Covenant House Leader Father Bruce Ritter. The press release also stated that a number of boys were willing to testify that Atkinson molested them while in the God's Child Project. A copy of the press release was sent to the Associated Press Reuters and to the New York Times. See Deposition of James McLaughlin, p. 92; Docket No. 85-114 at Bates CH143. The press release resulted in media inquiries to Atkinson and the God's Child Project.

On June 7, 1998, the McLaughlins sent another email to some of the recipients of the press release. See Docket No. 85-33. Apparently in response to reporters' statements that there was no record of Atkinson's arrest, the McLaughlins alleged that "[a] coverup is a strong possibility." On June 12, 1998, the McLaughlins distributed an article which appeared in the June 11, 1998,

3

Guatemalan newspaper <u>Siglo XXI</u>. The article contained accusations that Akinson had sexually abused children. <u>See</u> Docket No. 85-34. The McLaughlins claim that the source of their information for the press releases and emails was an investigator name Toledo. <u>See</u> Deposition of James McLaughlin, pp. 109, 196-199. James McLaughlin testified that he quit trusting Toledo in 1998 because Toledo had filed charges against Atkinson without first consulting an attorney. <u>See</u> Deposition of James McLaughlin, p. 80. However, McLaughlin sent the email and press release based on the information provided by Toledo even after McLaughlin had quit working with Toledo because he believed Toledo to be an untrustworthy person.

Sometime after leaving Guatemala and returning to the United States, the McLaughlins filed accusations of sexual abuse against Atkinson with the Federal Bureau of Investigations in Albuquerque, New Mexico and in Miami, Florida. <u>See</u> Deposition of James McLaughlin, pp. 117-118. The McLaughlins relayed the information they had learned from Toledo as well as additional accusations made previously by Bruce Harris ("Harris"). Harris was the successor to Atkinson's position in the Covenant House as the executive director for Casa Alianza - a Guatemalan charitable entity operated by the Covenant House. <u>See</u> Deposition of James McLaughlin, p. 126. Harris allegedly told the McLaughlins that Atkinson had purchased a home for male prostitutes and that Atkinson had taken inappropriate pictures of nude boys. <u>See</u> Deposition of James McLaughlin, pp. 122-123, 127-128. The McLaughlins also told the FBI that Atkinson was sexually abusing Francisco Choc, a boy in his care. The McLaughlins alleged that the adoption of Atkinson's son was somehow inappropriate. <u>See</u> Deposition of James McLaughlin, pp. 137-139. James McLaughlin testified that he had no personal knowledge whether Atkinson had sexually abused children or others, or whether Atkinson is a pedophile. <u>See</u> Deposition of James McLaughlin, p. 137.

During the summer of 1998, the McLaughlins sent numerous emails to Hanley Denning, a long-time God's Child Project volunteer, and relayed to her their allegations against Atkinson. See Docket No. 98-21. These emails were sent from May 19, 1998, to August 16, 1998, and repeated allegations that Atkinson had committed child abuse and claimed to know more about Atkinson. While asserting these allegations, the McLaughlins urged Denning to leave her position with the God's Child Project.

Sometime in 1998, after leaving Guatemala and discontinuing their work with Toledo, the McLaughlins hired Guatemalan Jose Reanda to investigate whether Atkinson and the God's Child Project were guilty of sexually abusing children. See Deposition of James McLaughlin, p. 58. The McLaughlins claim Reanda sent them a report in Spanish and they had it translated by a Spanish teacher. See Deposition of James McLaughlin, pp. 70-71. The McLaughlins published the contents of the report, but failed to keep a copy of the original report and did not take steps to verify the accuracy of the information contained in the report before sending it out. See Deposition of James McLaughlin, pp. 67-68, 72.

In late November of 1998, the McLaughlins created a website entitled "Friends of Guatemalan Children" at the domain name www.guatemalanchildren.org (the "website"). The website allegedly contains "both specific false statements about Atkinson and God's Child as well as innuendo, insinuations and unrelated inferences to and about various individuals that have been accused and, in some cases, convicted, of criminal and other wrongful conduct." Complaint, ¶ 24. Atkinson contends that the McLaughlins have used the website to conduct a "smear" campaign. The smear campaign included telephone calls made to God's Child Project board members, benefactors,

5

regional and local ecclesiastical authorities, and political authorities discouraging them from supporting the God's Child Project.  Complaint, ¶ 26.

In April and May of 1999, the McLaughlins repeatedly contacted the North Dakota Attorney General's Office concerning Atkinson and the God's Child Project.  See Docket No. 55.  On May 7, 1999, the McLaughlins spoke via telephone with David Huey, an Assistant Attorney General with the Attorney General's Office and told Huey that Atkinson had used charitable funds to buy a home for two teenage male prostitutes.  See Docket No. 85-38.  On April 10, 1999, the McLaughlins sent a letter to the North Dakota Attorney General accusing Atkinson of financial improprieties and child sexual abuse.  The McLaughlins also attached a copy of the Friends of Guatemalan Children website. The McLaughlins had sent a similar letter to the North Dakota Secretary of State.

On May 11, 1999, the McLaughlins sent out emails encouraging the recipients to contact the Attorney General and report any negative information about Atkinson.  See Deposition of John Huebsch.  On May 13, 1999, the McLaughlins sent another letter and a packet of material to the North Dakota Attorney General.  See Docket No. 55, Ex. 6.  The May 13, 1999, letter alleged that Atkinson was fired from Casa Alianza, the Guatemalan charitable organization operated under the Covenant House, and that Atkinson had taken inappropriate or exploitive nude photographs of children.  The McLaughlins attached numerous documents including a translation of the article published in Siglo XII.

On May 17, 1999, the McLaughlins sent another letter and attachments to the North Dakota Attorney General.  See Docket No. 55, Ex. 7.  The McLaughlins stated that their previous letter contained a newspaper article that discussed Atkinson's sexual abuse charge for sexually abusing the deaf-mute boy, Francisco Choc.  The letter indicated that the charge was made by Toledo based

6

on statements made by Choc's teacher and that the teacher had subsequently recanted the allegation. The letter also alleged that Atkinson was engaged in illegal activities, that the Center for Legal Action, a Guatemala human rights organization, had enough information to encourage the government to charge Atkinson with abusing children, and that he is protected from prosecution by the Guatemalan government. The Center for Legal Action has since stated that it does not possess any information which would support the McLaughlins' allegations. See Docket No. 55, Ex. 9. On May 19, 1999, the McLaughlins again emailed the North Dakota Attorney General stating that the Attorney General would soon be receiving a priority mail envelope that the McLaughlins had mailed that day. See Docket No. 55, Ex. 10.

On June 14, 1999, the McLaughlins sent a six-page fax to the North Dakota Attorney General. See Docket No. 55, Ex. 11. The June 14, 1999, fax included what the McLaughlins claim is a translation of three interviews with Guatemalan minors in which the minors allege that Atkinson sexually abused them. The interview was allegedly conducted by Toledo, whom the McLaughlins have now admitted they believed was untrustworthy as early as June of 1998. See Deposition of James McLaughlin, p. 80.

On July 18, 1999, the McLaughlins emailed John Huebsch ("Huebsch"), the executive director of Common Hope, a Minnesota charitable corporation. See Docket No. 97-9. The email stated that a boy, Francisco, had neither seen nor heard of any sexual abuse by Atkinson, but did say that Atkinson had told boys to drop their trousers and spanked them. The McLaughlins stated that they were just finishing the translation of a forty-seven (47) page report, ("Human Rights Report"), on an investigation into Atkinson and that they would send the report to the North Dakota Attorney General once it was finished.

7

On July 28, 1999, the McLaughlins sent a copy of the Human Rights Report to the North Dakota Attorney General. The Human Rights Report contained summaries of interviews of Guatemalan boys who were under Atkinson's care at one time. See Docket No. 55, Ex. 2. In the Human Rights Report several boys alleged that they witnessed acts of sexual abuse by Atkinson, and others alleged that they were the victims of sexual abuse by Atkinson. On September 2, 1999, the McLaughlins emailed May Sing, a former God's Child Project volunteer, and referenced some tapes. See Docket No. 55, Ex. 13. The McLaughlins requested that May send "the tapes" to the Attorney General's office when she was done viewing them. The record is devoid of the tapes.

Between February of 2000, and mid-June 2001, the McLaughlins sent numerous emails to Huebsch and others in an effort to obtain more information on Atkinson and the status of witnesses. See Docket No. 97-9. In an email to Huebsch dated June 15, 2001, the McLaughlins stated that it was likely that Toledo had attempted to bribe a witness to implicate Atkinson. See Docket No. 97-9, Ex. 18.

On March 30, 2002, the McLaughlins received an email from Wendell Krueth who described himself as president and investigative coordinator of www.predator-hunter.com. See Docket No. 97-8. Krueth's email stated that his organization is a child-advocate organization based in Ohio, and that he lives in Minnesota. Krueth requested information about Atkinson that he believed may be related to sexual abuse allegations against a Minnesota priest and the priest's accomplice who had traveled to Guatemala to do mission work. The McLaughlins replied to Krueth and requested more information, and ultimately forwarded the email chain to Huebsch. Atkinson contends that the McLaughlins' transmission of the forwarded email chain constitutes the publication of defamatory material against Atkinson.

On April 17, 2002, the McLaughlins received an email from Marilyn Moch ("Moch"), who serves on the International Association of Social Work, Human Rights Commission as Commissioner for North America. See Docket No. 85-45. Moch stated that she intended to make a trip to Bismarck and to visit the God's Child Project's board members and pastors of Bismarck churches. Moch requested that the McLaughlins provide her with a list of Bismarck churches who provide support to the Project. The McLaughlins then contacted Huebsch and asked him to forward information to Moch. See Docket No. 97-8.

On April 18, 2002, the McLaughlins sent Krueth and Moch several Bismarck Tribune articles as well as contact information for a pastor in Bismarck. See Docket No. 97-9. Krueth responded and stated that what he had seen up to that time had convinced him that Atkinson was "more than a bit shady, or worse." See Docket No. 97-9.

On May 22, 2002, Moch emailed the McLaughlins and requested more information about the Covenant House and Bruce Harris. See Docket No. 98-13. The McLaughlins forwarded Moch's request for information to Harris who then responded. On November 10, 2002, the www.guatemalanchildren.org website received an email from Bismarck Tribune reporter Deena Winter. See Docket No. 98-14. Winter requested more information about the God's Child Project, and the McLaughlins forwarded the email request to Moch and asked her to respond.

On February 27, 2003, the McLaughlins emailed Huebsch and confirmed that Winter was interested in writing an article on the God's Child Project. See Docket No. 97-8. In their February 27, 2003, email, the McLaughlins state that Moch had been at the trial of Carlos Toledo in Guatemala and heard Atkinson testify that he had married a woman in southeast Asia and had a son. The McLaughlins also included the link to their website, www.guatemalanchildren.org. On October

9

19, 2004, Huebsch emailed the McLaughlins and sought updated information about what was happening between the McLaughlins and Atkinson.

On February 21, 2005, Moch wrote to Richard Hirsch, Senior Vice President for Communications at the Covenant House, and informed him of Atkinson's and the God's Child Project's lawsuit against the McLaughlins. See Docket No. 98-17. On January 26, 2006, Atkinson and the God's Child Project were notified by Kiwanis International that they had been selected to be Kiwanis International's 2006 recipients of the Kiwanis World Service Medal. See Docket No. 121-2. The World Service Medal is accompanied by a $10,000 grant from the Kiwanis International Foundation to assist the recipient in service work. Atkinson and the God's Child Project were to receive the World Service Medal at the Kiwanis International's International Convention which was held on June 28-July 1, 2006.

On or about June 14, 2006, the Kiwanis International emailed a document entitled "Summary of Situation" to its board members. See Docket No. 121-3. The "Summary of Situation" document states that a "highly respected children's organization voic[ed] concerns about allegations surrounding Mr. Atkinson...." The document discussed the website, www.guatemalanchildren.org, and listed some of the allegations asserted against Atkinson including allegations made during Atkinson's time with Covenant House and with the God's Child Project. On June 16, 2006, the Kiwanis International informed Atkinson that they had rescinded the World Service Medal and that neither Atkinson nor the God's Child Project would receive the award. See Docket No. 120.

This action was commenced on July 28, 2003. See Docket No. 1. On August 30, 2005, Atkinson filed a "Motion to Amend Complaint," requesting in part leave to include a claim for punitive damages under Section 32-03.2-11 of the North Dakota Century Code. See Docket No. 52.

On November 29, 2005, the Court held Atkinson's request for leave to assert a claim of punitive damages in abeyance until the close of discovery. See Docket No. 64. On March 3, 2006, the Court entered a scheduling order setting a deadline of July 28, 2006, for Atkinson to file supplemental material and any additional briefs in support of the motion to add a claim for punitive damages and a deadline of August 18, 2006, for the McLaughlins to respond. See Docket No. 78.

On July 26, 2006, the McLaughlins filed a motion for summary judgment. On November 28, 2006, the Court denied the motion for summary judgment. See Atkinson v. McLaughlin, 462 F. Supp. 2d 1038 (D. N.D. 2006). The Court determined that Atkinson may proceed with the defamation claims arising from the McLaughlins' communications with the North Dakota Attorney General's Office in 1999 and those arising from communications that occurred after July 28, 2001. The Court also allowed Atkinson to proceed with his claims of tortious interference with business dating back to July 28, 1997, including the website created by the McLaughlins in November of 1998.

On July 28, 2006, Atkinson filed a "Supplemental Brief in Support of Motion for Punitive Damages." See Docket No. 84. Atkinson asserts that the McLaughlins have engaged in a continuing pattern of wrongful activities designed to defame and to tortiously interfere with Atkinson's business. Atkinson asserts that the sole purpose of the McLaughlins' communications with a network of individuals was to spread gossip and wrongful allegations of misconduct. The McLaughlins have not filed a response to the supplemental brief.

11

## II. LEGAL DISCUSSION

Section 32-03.2-11(1) of the North Dakota Century Code provides, as follows:

> In any action for the breach of an obligation not arising from contract, when the defendant has been guilty by clear and convincing evidence of oppression, fraud, or actual malice, the court or jury, in addition to the actual damages, may give damages for the sake of example and by way of punishing the defendant. Upon commencement of the action, the complaint may not seek exemplary damages. After filing the suit, a party may make a motion to amend the pleadings to claim exemplary damages. The motion must allege an applicable legal basis for awarding exemplary damages and must be accompanied by one or more affidavits or deposition testimony showing the factual basis for the claim. The party opposing the motion may respond with affidavit or deposition testimony. If the court finds, after considering all submitted evidence, that there is sufficient evidence to support a finding by the trier of fact that a preponderance of the evidence proves oppression, fraud, or actual malice, the court shall grant the moving party permission to amend the pleadings to claim exemplary damages. For purposes of tolling the statute of limitations, pleadings amended under this section relate back to the time the action was commenced.

N.D.C.C. § 32-03.2-11(1). This statute provides a substantive right and, therefore, applies to this federal court action. See Olson v. Ford Motor Co., Civ. No. A4-04-102, 2005 WL 3271945 (D. N.D. Nov. 29, 2005); Lowell v. Zurich Ins. Co., Civ No. A3-91-72, 1992 WL 212233 at *2 (D. N.D. Aug. 20, 1992) (applying North Dakota's punitive damage statute in a case where jurisdiction was predicated upon diversity of citizenship); see also Myers v. Richland County, 288 F. Supp. 2d 1013, 1021 (D. N.D. 2003) ("Exemplary damages statutes provide a substantive right and therefore state law applies.").

For the purposes of punitive damages, the term "oppression" means "subjecting a person to cruel and unjust hardship in conscious disregard of that person's rights." See North Dakota Pattern Jury Instructions C-72.10; see also Ingalls v. Paul Revere Life Ins. Co., 561 N.W.2d 273, 284-85 (N.D. 1997); Harwood State Bank v. Charon, 466 N.W.2d 601 (N.D. 1991); Napoleon Livestock Auction, Inc. v. Rohrich, 406 N.W.2d 346, 359 (N.D. 1987). "It is an act of subjecting to cruel and

unjust hardship, or an act of domination." Ingalls v. Paul Revere Life Ins. Group, 561 N.W.2d 273, 284-285 (N.D. 1997).

"Actual malice" is defined as "an intent with ill will or wrongful motive to harass, annoy, or injure another person." See North Dakota Pattern Jury Instructions C-72.16; see also Doe v. Southwest Grain, 309 F.Supp.2d 1119, 1127 (D.N.D. 2004); Maragos v. Union Oil Co. of CA, 584 N.W.2d 850, 852 (N.D. 1998); Ingalls v. Paul Revere Life Ins. Group, 561 N.W.2d 273 (N.D. 1997); McLean v. Kirby Co., 490 N.W.2d 229 (N.D. 1992); Stoner v. Nash Finch, Inc., 446 N.W.2d 747 (N.D. 1989).

> Actual malice is the actual state or condition of the mind of the person who did the act. Direct evidence of actual malice is not required. Rather, the character of the act itself, with its surrounding facts and circumstances, may be inquired into for the purpose of ascertaining the motive or purpose which influenced the mind of the party in committing the act. Thus, upon the consideration of these, if that motive is found to be improper and unjustifiable, the law authorizes the jury to find it was malicious.

Id. "Actual malice" refers to the actual state or condition of the mind of the person who did the act whereas "presumed malice" refers to the "that state of mind which is reckless of law and of the legal rights of the citizen in a person's conduct toward that citizen." Id. at 754. Notably, direct evidence of actual malice is not required to sustain an award of punitive damages. Id.

As a basis for awarding punitive damages, "fraud" is (1) the suggestion as fact of that which is not true by one who does not believe it to be true; (2) the assertion as a fact of that which is not true by one who has no reasonable ground for believing it to be true; (3) the suppression of a fact by one who is bound to disclose it, or who gives information that is likely to mislead because that fact was not communicated; or (4) a promise made without any intention of performing." See North Dakota Pattern Jury Instructions C-72.16; see also Dvorak v. Am. Family Mut. Ins. Co., 508 N.W.2d

13

329 (N.D. 1993); <u>Dewey v. Lutz</u>, 462 N.W.2d 435 (N.D. 1990); <u>Olson v. Frasse</u>, 421 N.W.2d 830 (N.D. 1988).

At this stage of the proceedings, the Court must determine whether Atkinson has demonstrated that there is a factual basis for a claim of punitive damages and whether there is sufficient evidence to support a finding by the trier of fact that a preponderance of the evidence proves oppression, fraud, or actual malice on the part of the McLaughlins.[2] Atkinson need not prove his claims at this stage. To require so would usurp the fact-finding province of the trier of fact.

The legal basis set forth by Atkinson in the brief in support of the motion to amend is as follows. Citing a case entitled <u>Vanover v. Kansas City Life Ins. Co.</u>, 553 N.W.2d 192, 197 (N.D. 1996), Atkinson contends that any proof of compensatory or actual damages will support an award of exemplary damages in this case.[3] Next, Atkinson contends that he is not required to show direct evidence of actual malice on the McLauglins part as the law presumes unlawful intent when a wrongful or unlawful act is willfully or deliberately committed. <u>See</u> <u>Stoner v. Nash Finch, Inc.</u>, 446 N.W.2d 747 (N.D. 1989); <u>McLean v. Kirby Co.</u>, 490 N.W.2d 229, 245 (N.D. 1992). Finally, Atkinson contends that the nature of conduct at issue evinces the McLaughlins iniquitous motives.

As for the factual basis for Atkinson's claims, Atkinson attests in an affidavit filed in support of the plaintiffs' motion that the McLaughlins (1) communicated to others their desire to destroy the God's Child Project, (2) sent a copy of a falsified "human rights report" to the North

---

[2]This matter is set for a bench trial to commence on March 26, 2007, in Bismarck, North Dakota.

[3]In <u>Vanover</u>, an insurance agent sued his former employer for defamation on the grounds that it had made false and unprivileged statements to his new employer that he had been terminated for cause. <u>See</u> 553 N.W.2d 192, 197. The jury found for the agent at trial . The trial court vacated the jury's verdict, however, and ordered a new trial. At the second trial the jury again found for the agent and awarded him special, compensatory, and exemplary damages. The trial court set aside the exemplary damages awards. On appeal, the North Dakota Supreme Court concluded that "proof in a libel action of any compensatory or actual damages will support an award of exemplary damages." Consequently, it reinstated the jury's verdict.

14

Dakota Attorney General, (3) maintain a website replete with false statements, innuendo, and insinuation; (4) distributed press releases containing false and misleading information; (4) worked with third-party surrogates in Guatemala to draft criminal charges and denouncements of him; and (5) attempted to discourage support from the God's Child Project's current and potential donors, sponsors, and volunteers. Atkinson further avers that all of the charges filed against the him in Guatemala have been dismissed, that several of the McLaughlins associates were charged, convicted, and subsequently imprisoned for filing false reports, and that criminal charges have been filed against the McLaughlins in Guatemala for filing false reports.[4] In the supplemental brief filed on July 28, 2006, Atkinson has presented additional evidence in the form of documents and excerpts of transcripts which support his claim for punitive damages. See Docket No. 84.

The McLaughlins assert that Atkinson has failed to submit proof of a damaged reputation or a decrease in fundraising receipts. The McLaughlins dismiss Atkinson's affidavit as self serving, asserting that the statements contained therein are not based on any personal knowledge but are instead founded upon inadmissible hearsay. Next, they assert that there is a dearth of evidence to establish either that their alleged conduct in any way sullied the plaintiffs reputations, stymied the plaintiff's fundraising efforts, or otherwise damaged the plaintiffs. They also assert that there is insufficient evidence to establish that they acted with oppression or actual malice. Finally, they cite to a case entitled Lange v. Wonnenberg for the proposition that intentional or willful conduct is not

---

[4]To supplement his affidavit, Atkinson submitted numerous documents for the Court's consideration, including an affidavit of a former God's Child Project case worker, printouts of the McLaughlins' website, copies of the "Human Rights Report" the McLaughlins allegedly sent to the North Dakota Attorney General, emails sent by the McLaughlins to the plaintiffs supporters, correspondence from the McLaughlins to the North Dakota Attorney General's Office, and advertisements submitted by Guatemalan authorities to the media stating that the plaintiffs had been exonerated of any wrongdoing. In addition, the Court has also reviewed the exhibits submitted in support of the motion for summary judgment.

synonymous with oppressive, fraudulent, or malicious conduct. See 455 N.W.2d 832, 842 (N.D. 1990). The McLaughlins have failed to respond to the evidence set forth in Atkinson's supplemental brief.

Atkinson initially responded that the record was replete with admissible evidence, citing as an example James McLaughlin's admission in discovery materials that he (1) owns the website at issue and (2) neglected to independently verify the statements posted thereon. In addition, Atkinson contends that the evidence has been erroneously characterized as hearsay by the McLaughlins and, in any event, would fall within exceptions to the hearsay rule. See N.D.R. Evid 801(2) and 803(3). Atkinson also contends that he is not required to quantify their damages in order to assert a claim for punitive damages. Further, Atkinson's supplemental brief identifies the specific deposition testimony which arguably supports his assertions.

Although proof of compensatory damages or actual damages would arguably support an award of exemplary damages, a plaintiffs' ability to assert a claim for punitive damages at this stage of the proceedings is not necessarily contingent upon the ability to prove the existence of actual or compensatory damages.[5] Likewise, it does not require that Atkinson first quantify the alleged compensatory damages. See Keller v. Bolding, 678 N.W.2d 578 (N.D. 2004) (stating that evidentiary imprecision on the amount of damages does not preclude recovery). Rather, it hinges upon Atkinson's ability to demonstrate that there is a factual basis for a claim of punitive damages and to persuade the Court that there is sufficient evidence to support a finding by the trier of fact that

---

[5]Atkinson will have to offer evidence to substantiate his claim that the McLaughlins conduct adversely affected their organizational and fundraising abilities as well as his standing at home and abroad. Such allegations of actual damages are sufficient at the pleading stage, however.

16

a preponderance of the evidence proves oppression, fraud, or actual malice on the McLaughlins' part. N.D. Cent. Code § 32-03.2-11(1).

Having reviewed the evidence submitted by Atkinson in support of the motion to amend, as well as the information provided by both parties in reference to the summary judgment motion, the Court finds that there is sufficient evidence to support a finding by the trier of fact that a preponderance of the evidence proves oppression, fraud, and/or actual malice. Admittedly, Atkinson has not provided concrete evidence that the McLaughlins cajoled others into fabricating charges against him. However, the evidence arguably establishes that the parties relationship has been tumultuous, that the McLaughlins orchestrated a negative public relations blitz against Atkinson after their relationship came to an end, that the McLaughlins have expended tremendous resources to publicize the accusations of child sexual abuse leveled against Atkinson as well as Atkinson's connection to others portrayed as morally and financially corrupt.

The Court finds that a reasonable trier of fact could conclude from this evidence that the McLaughlins acted oppressively, fraudulently, and/or maliciously. The McLaughlins will have the opportunity at trial to attack the credibility or otherwise refute this evidence. Whether the McLaughlins conduct was sufficiently egregious to merit punitive damages is a question of fact.[6]

---

[6] Given this matter is set for a bench trial, the Court finds that there is no need to discuss the need to bifurcate the proceedings pursuant to Section 32-03.2-11(2) of the North Dakota Century Code.

### III.  CONCLUSION

The Plaintiffs' Motion Leave to Assert Claim of Punitive Damages (Docket No. 52) is **GRANTED**.  The Plaintiffs shall have until March 1, 2007, to file an amended complaint.

**IT IS SO ORDERED.**

Dated this 15th day of February, 2007.

>   */s/  Daniel L. Hovland*
>   Daniel L. Hovland, Chief Judge
>   United States District Court